UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JACK DEMPSEY TILLMAN, JR.,

        Petitioner,

                                CASE NO. 2:06-CV-11555

  v.                               JUDGE VICTORIA A. ROBERTS
                                     MAGISTRATE JUDGE PAUL J. KOMIVES

DAVID BERGH,

        Respondent.[1]

_____/


# REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    D.    *Ineffective Assistance of Counsel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    E.    *Public Trial (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
             a. Default and Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
             b. Trivial Closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    F.    *Evidentiary Claim (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    G.    *Impartial Jury (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
         1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
         2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    H.    *Request to Amend the Record* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

_____

    [1]By Order entered this date, David Bergh has been substituted in place of Thomas Birkett as the proper respondent in this action.

I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

A.     *Procedural History*

1.     Petitioner Jack Tillman, Jr., is a state prisoner, currently confined at the Alger Maximum Correctional Facility in Munising, Michigan.

2.     On October 29, 2002, petitioner was convicted of conspiracy to commit murder, MICH. COMP. LAWS §§ 750.157a, 750.316(1)(a); assault with intent to commit murder, MICH. COMP. LAWS § 750.83, third-degree fleeing and eluding, MICH. COMP. LAWS § 750.479a(3); obstructing an officer, MICH. COMP. LAWS § 750.479; possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.750.227b; and possession of a firearm by a convicted felon, MICH. COMP. LAWS § 750.224f, following a jury trial in the Saginaw County Circuit Court.  On December 5, 2002, petitioner was sentenced to concurrent terms of life imprisonment on the conspiracy conviction, 29-50 years' imprisonment on the assault conviction, 3-5 years' imprisonment on the fleeing conviction, and 15 months' to 2 years' imprisonment on the obstructing conviction. Petitioner was also sentenced to consecutive terms of 3-7½ years' imprisonment on the felon in possession conviction and two years' imprisonment on the felony-firearm conviction.

3.     Petitioner filed a motion for new trial in the trial court, arguing that his counsel was ineffective for not objecting to evidence of a prior felony with respect to the felon in possession charge because he did not in fact have a prior qualifying felony under the felon in possession statute. On June 30, 2003, the trial court denied the motion for a new trial, but vacated the conviction and sentence on the felon in possession charge.

4.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE TRIAL COURT ERRED REVERSIBLY BY DENYING DEFENDANT'S MOTION FOR NEW TRIAL CLAIMING THAT HIS ATTORNEY'S FAILURE TO OBJECT TO THE INTRODUCTION OF EVIDENCE OF AN INADEQUATE PRIOR FELONY CONVICTION INTRODUCED TO PROVE DEFENDANT'S STATUS AS A PRIOR FELON FOR PURPOSES OF THE FELON-IN-POSSESSION CHARGE WAS INEFFECTIVE ASSISTANCE OF COUNSEL.

II.     DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A PUBLIC TRIAL BY THE COURT'S <u>SUA SPONTE</u> ACTION IN CLEARING THE COURTROOM OF SPECTATORS.

III.    DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF IRRELEVANT EVIDENCE THAT THE GUNS FOUND IN THE POSSESSION OF THE PERSONS IN THE CAR WERE STOLEN.

IV.     THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A MISTRIAL AFTER A JUROR WAS DISMISSED AND INTERVIEWS WITH INDIVIDUAL JURORS DISCLOSED THAT THEY BELIEVED THAT SOMEONE ON THE DEFENDANTS' SIDE HAD ATTEMPTED TO INFLUENCE THE DISMISSED JUROR.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Tillman*, No. 245442, 2004 WL 1459559 (Mich. Ct. App. June 29, 2004) (per curiam).

5.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Tillman*, 471 Mich. 954, 690 N.W.2d 116 (2004).

6.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on March 31, 2006. As grounds for the writ of habeas corpus, he raises the four claims that he raised in the state courts. On October 31, 2006, petitioner filed an amended petition through counsel. The amended petition raises the same four claims raised in the initial petition and in the state courts.

7.     Respondent filed his answer on December 1, 2006. He contends that petitioner's second and third claims are procedurally defaulted, and that all of the claims are without merit.

8.     Petitioner filed a reply to respondent's answer on December 21, 2006. Petitioner also filed a request to amend the record on May 22, 2007.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted in connection with the shooting of Fred Stewart on May 14, 2002, in Saginaw, Michigan. Petitioner was tried jointly with codefendants Terrance Williams and Saejar Parker.[2] The trial court proceedings were accurately summarized by the prosecution in its brief on appeal in the Michigan Court of Appeals:

> The People presented 16 witnesses and introduced over 50 exhibits at trial, including a map, a number of photographs and two videos. One video came from the Michigan State Police [MSP] patrol car involved in pursuing Defendants' vehicle, and a second video came from a City of Saginaw patrol car that arrived at the crash scene to assist with the apprehension of Defendants. (T II-VI)
> The evidence revealed that on May 14, 2002, at about 2:30 a.m., Fred Stewart was sitting outside his residence on Hess Street, near the corner of Russell Street, in the City of Saginaw. Stewart was in the passenger seat of his wife's car that was parked in the driveway. Stewart's wife had picked him up from work and had gone inside their apartment ahead of him. As he sat in the car drinking a beer that he had picked up on the way home from work, he suddenly heard gunfire. When he turned to look down the street he saw a tall black male, who appeared to have braids and appeared to be dressed in black, standing on the sidewalk. Although it was dark and he couldn't see a gun, Stewart did see gunfire. (T II 130-139, 155-158; X 2, 11/Map) Stewart quickly ducked down as shots were repeatedly fired at him in the car. He was hit four times by the gunshots and the car was hit numerous times on the passenger side of the car where Victim-Stewart was sitting. (T II 137-147; X 12, 13, 14) Stewart noted that approximately 5 to 10 minutes before the shooting, he had seen a white car with a black top drive past on a nearby street. (T II 147-151) Later examination of the victim's car revealed seven bullet holes in the vehicle - two at the top post of the door frame and five on the bottom area - below the window - of the passenger-side door. (T V 111-112) Five bullets were recovered from the vehicle. (T

---

[2]The trial initially also included a fourth codefendant, Elijah Tillman. His trial was severed from the other codefendants after his attorney became ill.

When the shooting stopped, Stewart looked up and saw no one was there, he ran to his parent's house farther down the street. From there, his father drove Stewart to the hospital. (T II 147; T VI 108)

Eric Harvey was a neighbor of Stewart's, who also lived on Hess Street near the intersection of Washington. Harvey was watching television in the early morning hours of May 14th, and heard multiple gunshots causing him to get on the floor. When the shots stopped, he got up, looked out the window and saw someone who appeared to be dressed in black get into the front, passenger-side of a white car that drove off fast. (T III 5-14, 23, 25; X 11/Map) Harvey admitted that although he told police, he thought the car had a black roof, he specified that he told them he wasn't sure if it did. (T III 20, 27)

Although conditions were very dark, investigators later noted that a mercury light provided some illumination in the area around the shooting scene. (T V 117-118, 124, 128-129)

Two state troopers working together on the midnight shift, in a fully marked car with a bubble on top, were in the City of Saginaw on patrol on May l4th. Their duties were primarily focused on alcohol enforcement. The patrol car contained a video camera located above and to the side of the rearview mirror. The weather was wet with a misty rain coming down. (T III 36-37, 83-88; T V 6-7) At approximately 2:30 a.m., the troopers observed a white four-door Grand Am on Hess Avenue, near South Washington. The white car was driving erratically across the lane divider and accelerating at an excessive speed. (T III 90-91; T V 7-8, 37) The speed limit on Hess was 30 mph, and the troopers observed that the white car was puffing away from them despite the patrol car speed of 40 mph. As they began to go after the white car, the video camera in the patrol car was activated and recorded much of the pursuit. The video reveals very little traffic in the area at the time of the pursuit. (T III 92-94; T V 10-11; X 18/MSP Video) The state police patrol vehicle, however, was behind the white car - at times as much as three blocks or more. In addition, when the car turned corners, there were periods where neither the video camera or the officers had a view of the white car. (T V 18; X 11/Map, 18/MSP Video)

When the troopers attempted to initiate a stop for speeding and traffic violations on Hess Street by turning on emergency lights, the white car ignored the signal and turned left onto Elizabeth Street, accelerating away when the patrol siren was activated. Trooper Campbell observed four black males in the white car at that point. About the time their siren was activated, the troopers observed a door on the driver's-side of the car open slightly and then shut. (T III 95-97; T V 14, 19, 41-45; X 18/MSP Video) The video clearly shows the door of the white car opening on Elizabeth Street. Trooper Tuer recalled, although the video is not clear, the driver's side door opening a second time on Hiland Street. (T III 97-98, 142; X 18/MSP Video) When the white car turned from Elizabeth Street onto Hiland - a residential street - the white car made a wide right hand turn - with the pursuing patrol car losing sight of the vehicle for several moments before making the turn also. The white car continued speeding at over 60 mph on Hiland Street - almost jumping the

banked intersections that it crossed. (T III 98-99; T V 15-18; X 11/Map, 18/MSP Video) After traveling almost 10 blocks on Hiland, the white car crashed at the intersection of Hiland and Coffingwood Streets, after making what appeared to be a 360 degree spin in the roadway, hitting a curb, a tree and then a utility pole. Defendant Tillman, wearing a blue and black jacket with black pants, immediately emerged from the driver's seat of the vehicle and began to run from the scene. Trooper Campbell jumped from the passenger seat of the patrol car and began to chase the apparent driver - Defendant. (T III 99- 102; T V 19-20; X 11/Map, 18/MSP Video)

Trooper Campbell chased Defendant Jack Tillman on foot through several yards, across and around a couple of fences, and across a street. Campbell then lost sight of Defendant, but continued searching with his flashlight. After conferring with two city officers, who had arrived to assist, Campbell found Defendant, wearing the blue and black coat, hiding under a porch behind a house. (T V 20-28, 35) Defendant was breathing heavily and had a distinctive deployed airbag odor - a connection to the deployment of car airbags at the time of the crash. (T V 25-26, 31, 55, 59, 63)

As he was being pulled from under the porch, Defendant Jack Tillman commented that he ran under the porch when he heard shots, that he hadn't been involved in any accident, and that he didn't know anything that was going on. (T V 55-56) At the station, Defendant Jack Tillman saw his cousin and said "hey, that's my cousin, were you involved in the accident, I heard they couldn't find the driver." (T V 57-58) Defendant was not advised of an accident or a missing driver prior to any of these statements. (T V 56, 58)

At the crash scene, Trooper Tuer immediately went to check out the crashed vehicle. (T III 101-102) He noted that the rear-seat passenger-window of the white car was open. (T III 172, 175) Tuer observed three people coming out of the car - Co-defendant Terrence Williams trying get out of the open rear-seat passenger window, Co-defendant Elijah Tillman coming out the door of passenger-side front seat, and Co-defendant Saejar Parker moving in the direction of the driver's-side door. (T III 102-104, 112-113, 172) All appeared to be attempting to get away. Trooper Tuer directed them back into the car to no avail. Defendant Elijah Tillman struggled and kicked the trooper, knocked his flashlight out of his hand, and eventually hit Trooper Tuer in the face with his fist, as well as attempting to pull the trooper's gun from the holster. Elijah Tillman continued to squirm and reach for something inside the car. He was only subdued after the use of pepper spray and with the assistance of another officer. Co-Defendant Williams struggled initially and squirmed to get away but then stopped. A city police officer arrived on the scene and assisted Trooper Tuer in gaining control and handcuffing the resistant Tillman. (T III 37-49, 63, 67-68, 106-118; X 18/MSP Video) The assisting city officer also had a video camera in his patrol car. (T III 35-41) This video also shows at least portions of the struggle to control Co-Defendant Elijah Tillman when the city officer arrived. (T III 46-49; X 15/City Video) The city officer sustained a severe injury to his hand as a result of the struggle with Co-defendant Elijah Tillman. (T III 52, 63-64)

Upon subduing Elijah Tillman, officers observed a handgun on the passenger-

side floor of the white car where he had been reaching. (T III 49-51, 71; X 5, 17, 18) Later investigation revealed that the gun was fully loaded. (T VI 10-12)

When Trooper Campbell returned to the crash scene after turning Defendant Jack Tillman over to other officers for transport, he looked inside the white car and observed two pistols - one on the front passenger-side floorboard, the other one on the rear passenger-side seat. Campbell also noted that front airbags had been deployed. (T V 31-34; X 4, 6, 7, 17, 23) Evidence officers also observed the guns in the vehicle and retrieved them for processing - a .45 caliber handgun on the floor board of the front passenger-side of the car and a .45 semi-automatic handgun on the back seat. The gun on the back seat was fully loaded but jammed. (T V 70, 73-76; X 5, 9, 17, 23, 44) A cell phone, a ski mask, and a glove were found next to the gun on the back seat, with another matching glove found on the floor. A set of keys and another stocking hat was found by the driver's seat, as well as a pager apparently belonging to Defendant. (T V 76-80; T VI 97-99) Officers also seized a fully loaded magazine from between the front passenger seat and door frame. (T V 71) Laboratory examination of the weapons revealed that the .45 caliber gun found on the front floorboard was a single action revolver loaded with hollow point bullets. (T VI 10-12)

At the scene of the shooting on Hess Street, officers found 16 spent casings. The casings were all 9-millimeter semi-automatic and were located in the same general area on the ground. Distinct footwear impressions were also observed - two near the spent casings. (T VI 82-84, 116-118; X 2, 3, 40, 41) Photographs and stone casts were made of the most distinct footwear impressions. (T V 116-120; T VI 44-52) At the police station, clothing and boots worn by Defendants were seized, including the dark blue hooded sweatshirt and the size 10 1/2 EEE Dickie work boots worn by Co defendant Terence Williams. (T VI 35-38; X 49, 50) The boots were later submitted to the crime lab, along with footwear impressions and photos from the crime scene. (T VI 44-46) Laboratory scientist David Stevens compared impressions made from the prints at the scene, with impressions from Williams' boots. He found the impressions from the shooting scene, near the shell casings, were consistent in pattern, size and relationship with Williams' boots and could have been made by them. (T V T VI 44, 46, 55-58)

At approximately 5 a.m., while it was still dark, officers looked over the pursuit route with flash and vehicle lights but did not see any evidence. (T VI 81-82, 124-126) At approximately 7 a.m., police officials were informed that a gun had been located along the route of the pursuit of the white car - specifically, on the south side of Hiland Street, near the corner of Owen. (T V 86-89, 98; X 11/Map; X 8, 32, 33/Photos) A student had seen the gun and reported it to a bus driver. The student also reported that he never touched the gun. (T V 134-135) Detective Gwizdala went to that area and surveyed the gun, it's position, location and the surrounding area. He also photographed the area and his findings. (T V 98-104) The gun had an empty clip in it and the slide was locked back. Detective Gwizdala explained that when you fire the last round that automatically locks the slide back. (T V 105-106; X 31) Detective Gwizdala also explained that the gun had dirt on it, in the barrel, about two inches

from the end of the barrel and grass stuck by the slide of the gun - indicating that when it struck the ground, the gun impacted into the soil, approximately two inches. He noted that the gun had a couple of marks reflecting impact - gouge marks on the grip and marks on the barrel. The marks on the gun appeared to come from striking something like concrete, the sidewalk area there. He located what he believed to be the impact area of the gun - about 66 feet from where the gun was eventually found. (T V 100-104, 137-138; X 30) Detective Gwizdala opined that the gun was thrown, from something, or a vehicle, moving at a high rate of speed. (T V 102, 138) More specifically, he indicated:

> It had been tossed out of a vehicle or some, something moving at a high rate of speed. It traveled a distance of 66 feet after - after it had struck the ground and buried in about two inches into the ground and then skidded along. (T V 131)

The pursuit video and exhibits established that the impact area and the gun were found in the grass, past the sidewalk, in an area that would be on the passenger side of the car. (T V 157) The location was a short distance from a turn where the troopers and video lost sight of the white car for at least a couple of seconds before making the turn themselves. (X 11/Map; X 18/MSP Video)

Laboratory examination of the gun found embedded in the dirt and grass revealed that it was a 9-millimeter luger, semi-automatic pistol and also revealed dirt in the barrel and grass in the grips. (T VI 18-19, 29; X 30) Firearms expert, Ronald Ainslie, concluded that the 16, fired, 9-millimeter cartridges found at the shooting scene in this case were fired from this 9-millimeter pistol/Exhibit 30 found on Hiland Street. (T VI 26, 31; X 30) He also explained that if this gun was fired at night, you could see the fire shoot out the end of the barrel. (T VI 30)

Detective Ruth testified, without objection, that the investigation revealed two of the three guns in issue had been stolen, including the 9 millimeter. The third gun had been circulating since 2000 from the person who originally owned it, to someone it was traded to, and then someone who bought it and others. (T VI 134-136)

At the close of the People's case, counsel for each Defendant moved for a directed verdict of acquittal. (T VI 139-146) The trial court denied the motions in their entirety as to Defendants Jack Tillman and Terrance Williams. (T VI 151-153) For Defendant Saejar Parker, the trial judge granted the motion for directed verdict on Count I - Conspiracy and Count II - assault with intent to murder. (T VI 153-154)

On Monday, October 28, 2002, at the beginning of the 7th day of trial, juror Linda McKether reported to the court that someone had made a statement to her about the case over the weekend. She explained that she was at work at a Kessel's store in Saginaw. While she was there, a male who was coming out of the store approached her as she was coming inside after a break. She believed that he knew she was a juror. He asked her to do what she could and she understood this to mean "do what you can for somebody involved in the case." (T VII 4-7) She was not threatened, but she was very upset and wanted to be taken off of the jury. (T VII 5-10) Counsel for each of the Defendants had an opportunity to question Ms.

McKether. (T VII 4-9) The Court excused her and counsel for Defendant Parker objected. (T VII 8-10)

Because Juror McKether indicated that she told the other jurors she had been contacted, the judge proceeded to question each of the jurors, individually, about the situation. Counsel for the Defendants had an opportunity to question the jurors as well. Each of the remaining jurors indicated that they did not feel intimidated by the contact incident experienced by Juror McKether and would not let the situation affect their decision in the case. (T VII 9-50) At the conclusion of the individual questioning of each juror, the trial judge noted:

> [The] Court believes, after questioning each of the individual jurors, that none of the jurors have been contaminated other than Ms. McKether by this contact which was made directly to her. (T VII 50)

All of the defense counsel, however, joined in a request for a mistrial on the basis that the one black female juror was approached and she was afraid and it might or could have detrimental effect on the Defendants. (T VII 51-52) The trial judge denied the motion for mistrial, stating:

> The Court has questioned each and every one of the jurors. They've all indicated to the Court that whatever occurred with Ms. McKether didn't have any impact on them. They continue to indicate to the Court that they were not compromised in any way, and the motions for mistrial are denied. (T VII 52)

At that point, defense counsel for Williams indicated he had one witness to call before closing arguments. (T VII 52) The trial judge then indicated:

> I'm going to keep the--so that we don't have any more problems, I going to keep the courtroom clear of everybody except the people that are involved in the case, the defendants, and the officers that are involved. (T VII 52)

The jury returned to the courtroom and counsel for Defendant Williams then called witness Barry Nelson, the Central Dispatch 9-1-1 operator. He was questioned about whether patrol car cameras have their clocks or timers synchronized with Central Dispatch and explained that the time or clock on the camera and video is not connected to Central Dispatch in any way. (T VII 56-57) Counsel for each of the Defendants then rested. (T VII 58)

As the prosecutor began his closing argument, counsel for Defendant Parker, joined by the other defense counsel, requested that the judge open the courtroom for friends and family of the Defendants. (T VII 59-60) The trial judge agreed to do so and opened the courtroom. (T VII 60)

* * * *

Defendant Jack Tillman filed a motion for new trial and resentencing for which a hearing was held on June 30, 2003. (Dkt; MT 6/30/03) The motion for new trial was denied but the court vacated Defendant's conviction for Possession of a firearm by a felon and the Felony firearm conviction based on Felon in possession. The claim of ineffective assistance was determined to be unfounded and the request for new trial on that basis was denied. (Dkt; Op & Order 8/22/03) On the defense

motion for reconsideration, the trial court granted resentencing based upon Defendant Tillman's claim that his habitual offender status was inaccurate at his initial sentencing. (Dkt; Resentencing T 3-4, 16-20)

Appellee's Br. on Appeal, in *People v. Tillman*, No. 245442 (Mich. Ct. App.), at 2-14; *see also*, *Tillman*, 2004 WL 1459559, at *1-*2, slip op. at 2-3; Amended Pet., at 2-5.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts

them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Ineffective Assistance of Counsel (Claim I)*

Petitioner first contends that his attorney was constitutionally ineffective for failing to object to the introduction of his prior felony conviction, because that conviction was not a predicate felony under the felon in possession statute. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *See id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

2.     *Analysis*

As explained in the procedural and factual background portions of this Report, petitioner was originally charged with and convicted of being a felon in possession of a firearm under MICH. COMP. LAWS § 750.224f. Prior to trial, the parties stipulated that the prosecutor would be permitted to introduce petitioner's prior marijuana possession conviction as proof of his prior felony conviction. *See* Trial Tr., Vol. I, at 18-22. At trial, the jury was informed that the parties had stipulated that petitioner had a prior felony conviction, but was not informed of the nature or circumstances of that conviction. *See id*., Vol. VI, at 137. After trial, petitioner filed a motion for new trial, arguing that counsel was ineffective because the prior conviction was not a qualifying "felony" under § 750.224f. The trial court found that petitioner was entitled to vacatur of the felon in possession conviction, but was not entitled to a new trial with respect to the remaining convictions. On appeal, the Michigan Court of Appeals rejected petitioner's ineffective assistance claim, concluding that petitioner could

not show that he was prejudiced by the mention of his prior felony.  The court reasoned:

> In light of the strong evidence against him, Tillman fails to demonstrate that the jurors would have acquitted him of the other charges if only the trial court had not briefly and vaguely disclosed that he had an earlier felony conviction.  Also, juries are presumed to follow their instructions, and the trial court in this case reminded the jurors that they "must consider each crime separately in light of all of the evidence."  Because knowledge of the earlier felony did not fatally impair the reliability of the jury verdict, the trial court did not abuse its discretion when it denied Tillman's motion for a new trial.

*Tillman*, 2004 WL 1459559, at *3, slip op. at 4.  The Court should conclude that this determination was reasonable.

Here, petitioner has not shown that the brief, unadorned mention that he had a prior felony conviction prejudiced him in light of the evidence against him.  In support of his claim of prejudice, petitioner notes that there was no direct physical or eyewitness evidence connecting him to the crime.  While this is true, there was significant circumstantial evidence of his involvement.  Trooper Campbell testified that he saw the driver of the vehicle exit the car after the crash, and that he chased after the driver.  Trooper Campbell identified the driver as wearing a black and blue coat with black pants.  Although Trooper Campbell lost sight of the man he was pursuing, he shortly thereafter found petitioner (a) hiding under a porch, (b) wearing the same clothing as the driver, (c) breathing heavily, and (d) carrying an odor consistent with a deployed air bag.  *See* Trial Tr., Vol. V, at 19-26.  Further, at the police station petitioner yelled to his cousin, "were you involved in the accident, I heard they couldn't find the driver," *id*. at 57-58, even though he had not been told about either the accident or the fact that the driver was missing, *see id*. at 56, 58, suggesting that he had in fact been involved in the crash.  And, there was significant evidence that the persons in the car which crashed were the ones responsible for the shooting.  While the evidence of petitioner's involvement may have been circumstantial, the evidence showed "*many* 'trout in the milk.'" *United States v. Honken*,

381 F. Supp. 2d 936, 1010 (N.D. Iowa 2005) (quoting HENRY DAVID THOREAU, THE JOURNAL (from the entry for November 11, 1850) (reprinted in THE HEART OF THOREAU'S JOURNALS 40 (O. Shepard ed., Dover Pub.1961)) ("Some circumstantial evidence is very strong, as when you find a trout in the milk.").

Against this evidence, it is not reasonably probable that the mere mention of petitioner's prior felony conviction as part of a stipulation, with no discussion of the nature or circumstances of the conviction and no comment from the prosecutor on the prior conviction during closing argument, affected the jury's verdict. *See Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *34 (E.D. Mich. Oct. 24, 2007) (Edmunds, J., adopting recommendation of Komives, M.J.); *cf. Buehl v. Vaughn*, 166 F.3d 163, 176 (3d Cir. 1999). In short, in light of the evidence against petitioner and the brief mention of the conviction unadorned by any details or any argument from the prosecutor suggesting that the conviction should be used to convict petitioner on a "bad man" theory, "[t]his evidence was of such minimal impact that there is no reasonable probability that, but for counsel's failure to attempt to have it excluded, the outcome of Petitioner's trial would have been different." *Alder v. Burt*, 240 F. Supp. 2d 651, 674 (E.D. Mich. 2003) (Gadola, J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Public Trial (Claim II)*

Petitioner next contends that he was denied his Sixth Amendment right to a public trial when the trial court closed the courtroom for the testimony of one witness. The Court should conclude that petitioner is not entitled to habeas corpus relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that an accused in a criminal prosecution

shall enjoy "the right to a speedy and public trial." U.S. CONST. amend. VI. In a number of cases, the Supreme Court has held that "the press and public have a qualified First Amendment right to attend a criminal trial." *Waller v. Georgia*, 467 U.S. 39, 44 (1984) (discussing *Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501 (1984); *Glove Newspaper Co. v. Superior Ct. for Norfolk County*, 457 U.S. 596 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979)). In these earlier First Amendment cases, the court had held that the public trial right is not absolute, and "may give way in certain cases to other rights or interests, such as defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45. Nevertheless, there is a presumption in favor of openness which may be overcome "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enterprise*, 464 U.S. at 510.

In *Waller*, the Court extended this test to the Sixth Amendment Public Trial Clause, explaining that "[t]he central aim of a criminal proceeding must be to try the accused fairly, and 'our cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant.'" *Waller*, 467 U.S. at 46 (quoting *Gannett Co.*, 443 U.S. at 380). The Court based its determination on the benefits secured to an accused by a public trial: "'that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibilities and to the importance of their functions.'" *Id.* (quoting *In re Oliver*, 333 U.S. 257, 270 n.25 (1948)). The Court also explained that "a public trial encourages witnesses to come forward and discourages perjury." *Id.* Thus, the Court

held that "under the Sixth Amendment any closure . . . over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors." *Id*. at 47. The Court also held that a violation of the right to a public trial is not amenable to harmless error review, holding "a defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Id*. at 49. Nevertheless, a new trial is not appropriate in every case of a violation; rather, "the remedy should be appropriate to the violation." *Id*. at 50.

2. *Analysis*

At trial, the court had closed the courtroom to examine the jurors regarding an out-of-court contact made to one of the jurors involved in the case.[3] After that issue had been resolved, the court stated: "I'm going to keep the–so that we don't have any more problems, I'm going to keep the courtroom clear of everybody except the people involved in the case, the defendants, and the officers that are involved." Trial Tr., Vol. VII, at 52. Counsel for defendant Williams then called witness Barry Nelson, a 911 operator. His testimony–including cross- and redirect examination–lasted only four minutes, and was limited to the question of whether the clocks on patrol car cameras and computers are synchronized with the clock on the computers at Central Dispatch. *See id*. at 53-57. As the prosecutor began his closing argument, counsel for defendant Parker, joined by counsel for all the defendants, requested that the court open the courtroom for friends and family of the defendants, and the court granted that request. *See id*. at 59-60.

Were the Court obligated to apply the *Press-Enterprise* test, as adopted by *Waller*, petitioner may very well be entitled to relief. There does not appear to have been any need to keep the

---

[3]Petitioner does not challenge the trial court's initial closure of the courtroom to question the jurors regarding the alleged improper contact.

courtroom closed for the testimony of Nelson, and the trial court certainly did not make the specific, detailed findings necessary to support a closure under *Press-Enterprise* and *Waller*. This test is not applicable here, however, for two reasons, and for these reasons the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a. Default and Forfeiture

First, petitioner's public trial claim is both procedurally defaulted and forfeited. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, the Michigan Court of Appeals clearly and expressly relied on Michigan's contemporaneous objection rule to decline to review petitioner's claim for anything other than plain error. The court stated: "In this case, nobody objected to the brief closure, so the issue was not

preserved for appeal." *Tillman*, 2004 WL 159559, at *3, slip op. at 4. The court therefore held that review of the claim was limited to determining whether the trial court committed plain error affecting petitioner's substantial rights, citing to *People v. Carines*, 460 Mich. 750, 597 N.W.2d 130 (1999). *See Tillman*, 2004 WL 159559, at *3, slip op. at 4. This constitutes a clear and express reliance on a firmly established and regularly followed state court procedural rule, independent of the merits of the federal constitutional claim, and thus imposes a procedural bar to this Court's consideration of the claim. *See Page v. Metrish*, No. 2:06-CV-12229, 2008 WL 2217933, at *4 (E.D. Mich. May 27, 2008) (Steeh, J.); *Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 454 (E.D. Mich. 2004) (Gadola, J.). Indeed, the Michigan Court of Appeals has explicitly applied the contemporaneous objection rule to public trial claims. *See People v. Gratton*, 107 Mich. App. 478, 481, 309 N.W.2d 609, 611 (1981).

In his reply, petitioner raises a number of arguments to reject this conclusion of default, none of which is persuasive. First, petitioner notes that the court of appeals cited to page 763 of *Carines*, which involved a discussion of only nonconstitutional error. The Michigan Supreme Court's discussion of constitutional error occurred later in the opinion, and thus petitioner argues that the court of appeals did not apply a state procedural rule adequate to justify barring a constitutional error. The problem with this argument is that the *Carines* court expressly adopted the standard for forfeited nonconstitutional error discussed on page 763 as the same standard governing review of forfeited constitutional errors. *See Carines*, 460 Mich. at 764-65, 597 N.W.2d at 138-39. Because the rule is the same for constitutional and nonconstitutional errors, the rule relied upon by the court of appeals was an adequate independent state ground regardless of whether the court cited to the wrong page of the decision.

Second, petitioner contends that the court nevertheless considered the merits of the claim under the plain error standard. It is well established, however, that review of an otherwise defaulted claim for plain error does not negate the finding of a procedural default. *See Page*, 2008 WL 2217933, at *4; *Skrzycki*, 347 F. Supp. 2d at 455 (both citing *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir.2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir.2000)).

Third, petitioner argues that *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415 (6th Cir. 2005), the case relied upon by respondent, is distinguishable because in that case the state court had relied on an actual rule of procedure codified in the Ohio Rules of Criminal Procedure, whereas in his case the state court merely relied on a rule of procedure derived from case law. This distinction, however, is irrelevant to the procedural default inquiry. Procedural default requires only that the state law procedural rule be firmly established and regularly followed. It does not require that the rule be codified by statute or rule, and judicially crafted rules are sufficient so long as they are, indeed, firmly established and regularly followed.

Finally, petitioner argues that the procedural bar relied upon by the court of appeals was not independent of federal law. As the Supreme Court has explained, "there is no independent and adequate state ground for a state court decision when the decision appears to rest primarily on federal law, or to be interwoven with the federal law[.]" *Coleman*, 501 U.S. at 735. Petitioner reasons that *Carines* adopted the federal plain error standard of *United States v. Olano*, 507 U.S. 725 (1993), which in turn applied Rule 52(b) of the Federal Rules of Criminal Procedure. This, petitioner argues, constitutes a reliance on federal law in rejecting the claim. Petitioner's argument is without merit. The statement in *Coleman* means that a court will not apply a procedural bar where the state court, in purporting to enforce the bar, relied on federal law relating to the merits of the

claim. *See Harris*, 489 U.S. at 260 (emphasis added) (court will not review federal claim where the state court judgment "rests on a state law ground that is both 'independent' *of the merits of the federal claim* and an 'adequate' basis for the court's decision."). The fact that the Michigan Supreme Court adopted the federal standard as the state standard for handling forfeited errors does not render the state rule any less of a state rule. To borrow from the Fifth Circuit:

> The use of federal law as guidance for the enactment and application of the [Michigan rule] cited by the [Michigan Court of Appeals] as the basis for its rejection of [petitioner's] claim does not, as [petitioner] suggests, mean that the court's decision rested primarily on federal law or was interwoven with federal law. No application or interpretation of federal law is required to determine whether a claim [was not raised at trial through a contemporaneous objection]. The [Michigan Court of Appeals] did not need to consider or decide the merits of [petitioner's] constitutional claim[] in reaching its decision to [decline to review that claim other than for plain error]. Furthermore, there is nothing in its [application of the procedural bar] that suggests that it actually considered or ruled on the merits. Accordingly, its decision was independent of federal law for purposes of application of the procedural default doctrine. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002).

*Hughes v. Quarterman*, ___ F.3d ___, ___, 2008 WL 2300252, at *5 (5th Cir. June 5, 2008); *see also*, *McFarland v. Yukins*, No. 99-1659, 2000 WL 1290125, at *2 (6th Cir. Sept. 5, 2000) (rejecting district court's conclusion that MICH. CT. R. 6.508(D) is not an adequate state ground because it is based on federal procedural default rules).[4]

---

[4]In *Salem v. Yukins*, 414 F. Supp. 2d 687 (E.D. Mich. 2006) (Friedman, J.), the Court concluded that the petitioner's *Waller* claim was not procedurally defaulted. That case is distinguishable on two grounds. First, in *Salem* the purported default was not petitioner's failure to lodge any objection, but on petitioner's failure to specifically cite to *Waller* or argue that more narrowly drawn alternatives were available. This rendered the procedural default analysis intertwined with the merits of the federal constitutional claim. *See id*. at 695-96. Further, the trial of the petitioner in *Salem* occurred prior to the Michigan Supreme Court's decision in *Carines*, during a time when the Michigan courts routinely reviewed constitutional claims despite a failure to object. *See id*. at 696-97. As explained above, *Carines* abrogated this rule and establish a forfeiture rule applicable equally to constitutional and nonconstitutional claims. Thus, *Salem* is not contrary to the conclusion I reach above.

Petitioner also argues that, even if his claim is defaulted, it can nevertheless be considered on the merits because his attorney's ineffectiveness in failing to object to the closure of the courtroom constitutes cause to excuse his procedural default. To establish "cause," petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also*, *Coleman*, 501 U.S. at 753. As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray*, 477 U.S. at 488-89). In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment. *See id.* "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id.* For this reason, the ineffective assistance claim which is asserted as cause must itself be both exhausted, *see id.* at 451-52 (discussing *Murray*, 477 U.S. at 489), and not procedurally defaulted, *see id.* at 452-53. Here, petitioner has never presented, in any fashion, his ineffective assistance of counsel claim relating to the closing of the courtroom to the Michigan courts. It is therefore unexhausted, and cannot be used as a basis to establish cause to overcome his procedural default. *See Lott v. Coyle*, 261 F.3d 594, 608-09 (6th Cir. 2001).[5]

---

[5]Even if the ineffective assistance of counsel claim could otherwise be asserted as cause, petitioner cannot show that counsel was ineffective. Notwithstanding the fact that a substantive public trial claim is not subject to harmless error review, a petitioner asserting that counsel was ineffective for failing to object to a courtroom closure must still establish prejudice under *Strickland*. *See Purvis v. Crosby*, 451 F.3d 734, 740-43 (11th Cir. 2006). Here, petitioner points to no harm flowing from the brief closure of the courtroom. All of the participants were present, including his counsel and that of his codefendants, and the closure lasted for four minutes of testimony on a collateral, technical matter.

Further, even if the procedural default doctrine did not itself bar petitioner's claim, the claim was forfeited under *Waller* by petitioner's failure to object. In *Waller* itself the Court held only that "any closure . . . *over the objection of the accused* must meet the tests set out in *Press-Enterprise* and its predecessors." *Waller*, 467 U.S. at 47 (emphasis added). The Court did not suggest that a violation of the Sixth Amendment public trial right can be shown where the defendant either actively or passively acquiesces in the closure. This holding was consistent with its earlier decision in *Levine v. United States*, 362 U.S. 610 (1960). In that case, the Court considered a defendant's conviction for criminal contempt following his refusal to answer grand jury questions, the proceedings for which occurred in a closed courtroom. Although the Sixth Amendment was not directly applicable because the contempt proceeding was not a "criminal prosecution," the Court recognized a parallel public trial right under the Due Process Clause. *See id*. at 616. And, the Court rejected the defendant's claim, explaining:

> The continuing exclusion of the public in this case is not to [be] deemed contrary to the requirements of the Due Process Clause without a request having been made to the trial judge to open the courtroom at the final stage of the proceeding, thereby giving notice of the claim now made and affording the judge an opportunity to avoid reliance on it. This was not a case of the kind of secrecy that deprived petitioner of effective legal assistance and rendered irrelevant his failure to insist upon the claim he now makes. Counsel was present throughout, and it is not claimed that he was not fully aware of the exclusion of the general public.

*Id*. at 619. Although *Levine* was decided under the Due Process Clause, it is clear that it establishes a rule equally applicable to the Sixth Amendment. *See Peretz v. United States*, 501 U.S. 923, 936 (1991) (parenthetically describing *Levine* as holding that "failure to object to closing of courtroom is waiver of right to public trial."). Taken together, *Levine* and *Waller* establish that "[w]here a defendant, with knowledge of the closure of the courtroom, fails to object, that defendant waives his right to a public trial." *United States v. Hitt*, 473 F.3d 146, 155 (5th Cir. 2006); *see also*, *id*. at 155

n.8 (describing how this rule is consistent with *Waller*).[6] Thus, even if petitioner's claim were not

barred by the procedural default doctrine, the claim is nonetheless waived under the Supreme Court

cases discussing the substantive public trial right.

### b. Trivial Closure

Second, even assuming that petitioner's claim is procedurally viable, *Waller* is inapplicable

here. *Waller* involved a complete closure of the courtroom for the entirety of a proceeding (in that

case, a suppression hearing), that went well beyond the stated reasons for the closure. A number of

courts "have distinguished the complete closure in *Waller* from partial closures," *Garcia v. Bertsch*,

470 F.3d 748, 752 (8th Cir. 2006), applying a lesser standard to partial closures. *See id*. at 753

(citing cases). Indeed, the Supreme Court itself recognized this distinction in *Press-Enterprise*,

noting that when only a limited closure is at issue, "the constitutional values sought to be protected

by holding open proceedings may be satisfied later by making a transcript of the closed proceedings

available within a reasonable time." *Press-Enterprise*, 464 U.S. at 512. More importantly, the

courts have uniformly held that "[w]hile a defendant generally has a Sixth Amendment right to a

public trial, in certain situations the exclusion of . . . the public can be too trivial to amount to a

violation of the Sixth Amendment right." *United States v. Izac*, 239 Fed. Appx. 1, 4 (4th Cir. 2007)

(citing *United States v. Perry*, 479 F.3d 885, 890 (D.C. Cir. 2007); *see also*, *Carson v. Fischer*, 421

F.3d 83, 92-93 (2d Cir. 2005); *United States v. Ivester*, 316 F.3d 955, 960 (9th Cir. 2003); *Braun v.*

---

[6]This conclusion is not inconsistent with the fact that the public trial right is a fundamental one. "[T]here is nothing 'internally inconsistent' about believing that a procedural guarantee is fundamental while also believing that it must be asserted in a timely fashion. It is a universally acknowledged principle of law that one who sleeps on his rights–even fundamental rights–may lose them." *Neder v. United States*, 527 U.S. 1, 35 n.1 (1999) (Scalia, J., concurring in part and dissenting in part). *See generally*, *United States v. Olano*, 507 U.S. 725, 731 (1993); *Yakus v. United States*, 321 U.S. 414, 444 (1944).

*Powell*, 227 F.3d 908, 918 (7th Cir. 2000).  To be clear, this triviality rule is not the same as a finding of harmless error, which is precluded by *Waller*.  The triviality standard does not amount to a finding that there was error but that it was harmless; rather, it amounts to a finding that "the exclusion cannot be characterized properly as implicating the constitutional guarantee." *Braun*, 227 F.3d at 918.  As the Second Circuit has explained:

> A triviality standard, properly understood, does not dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that he did not suffer "prejudice" or "specific injury."  It is, in other words, very different from harmless error inquiry.  It looks, rather, to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant–whether otherwise innocent or guilty–of the protections conferred by the Sixth Amendment.

*Peterson v. Williams*, 85 F.3d 39, 42 (2d Cir. 1996).

In the case of a trivial closure, the analysis turns on whether the conduct at issue "subverts the values the drafters of the Sixth Amendment sought to protect," *Smith v. Hollins*, 448 F.3d 553, 540 (2d Cir. 2006), namely: "1) to ensure a fair trial; 2) to remind the prosecutor and the judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Peterson*, 85 F.3d at 43 (citing *Waller*, 467 U.S. at 46-47); *see also*, *Braun*, 227 F.3d at 918.

Here, the closure of the courtroom lasted for only four minutes, covering the testimony of a single witness who gave technical testimony on a collateral point.  The closure was a continuation of the proper closure of the courtroom to question the jurors concerning an improper contact, and was continued by the judge on the perhaps "mistaken belief that such an exclusion would enhance, not detract, from the integrity of the proceedings." *Braun*, 227 F.3d at 919.  The closure lasted for only four minutes of testimony, and that testimony itself was not contested and was a technical matter on a collateral issue. *Cf. Brown v. Kuhlmann*, 142 F.3d 529, 541 (2d Cir. 1998) (closure of

courtroom trivial where "the closure . . . took place during testimony which–if not innocuous–was clearly cumulative on the collateral issue for which it was offered.").  This is not a case where it "could be charged that the judge deliberately forced secrecy in order to be free of the safeguards of the public's scrutiny." *Levine*, 362 U.S. at 619.  Further, "[t]his is not a case like *Oliver* or *Waller* where the court conducted a hearing in the absence of the jurors and the public." *Carson*, 421 F.3d at 93.  Although the general public was excluded for the brief period, during that time the presence of "law enforcement personnel, counsel, and members of the jury during [Nelson's] testimony clearly safeguarded the first, second, and fourth reasons for the public trial right." *Id*.; *cf. Braun*, 227 F.3d at 919 n.8 (quoting *Aaron v. Capps*, 507 F.2d 685, 687-88 (5th Cir. 1975)).  Further, the testimony was transcribed, which although not dispositive "'does bear on how seriously the values served by the Sixth Amendment were undermined.'" *Carson*, 421 F.3d at 93 (quoting *Peterson*, 85 F.3d at 43; *cf. Press-Enterprise*, 464 U.S. at 512.  In these circumstances, the closure was so trivial that it did not amount to a violation of the public trial guarantee.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his public trial claim.

F.     *Evidentiary Claim (Claim III)*

Petitioner next contends that he was denied a fair trial by the introduction of evidence that the guns found in the vehicle were stolen.  The court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Analysis*

At trial, Detective Ruth testified that one of the guns found in the vehicle had previously been stolen, *see* Trial Tr., Vol. VI, at 134-36, and that the other gun was unregistered and had changed hands multiple times, *see id*. at 135. The Michigan Court of Appeals rejected petitioner's claim that this evidence was improperly admitted, explaining that "[t]he evidence of the guns' origins and histories related to the issues of possession and the shooter's identification. The jury could also infer that defendants used untraceable guns so police could not link them to their planned assault. Under these circumstances, the information represented a telling portion of the complete picture[.]" *Tillman*, 2004 WL 1459559, at *3, slip op. at 4. Petitioner now contends that the introduction of this evidence denied him a fair trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). Here, as the court of appeals explained, the evidence relating to the guns' histories was relevant to give a complete picture of the crime, in particular the various possession charges. Because the evidence was relevant, its admission did not deprive petitioner of a fair trial even if its admission was erroneous as a matter of state law.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Impartial Jury (Claim IV)*

In his final claim, petitioner contends that he was denied his right to an impartial jury when the court failed to declare a mistrial after a juror reported that she had been contacted and asked to "do what you can for somebody involved in the case."  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury.  *See Duncan v. Louisiana*, 391 U.S. 145, 147-49 (1968).  Thus, a defendant is entitled to a have a panel of impartial, "indifferent" jurors.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  In *Remmer v. United States*, 347 U.S. 227 (1954), the Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer*, 347 U.S. at 229.  Although *Remmer* spoke of a "presumption of prejudice," the Court has subsequently indicated that a defendant alleging improper juror contact must demonstrate actual prejudice.  In *Smith v. Phillips*, 455 U.S. 209 (1982), the Court cited *Remmer* in stating that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove bias."  *Smith*, 455 U.S. at 215.  As the Court explained:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. . . .  [I]t is virtually impossible to shield jurors from

> every contact or influence that might theoretically affect their vote. Due process
> means a jury capable and willing to decide the case solely on the evidence before it,
> and a trial judge ever watchful to prevent prejudicial occurrences and to determine
> the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217.   In light of *Smith*, the presumed prejudice language of *Remmer* is no longer good law; all that is required is a hearing at which the defendant is given the opportunity to establish that the improper contact caused actual prejudice.  *See United States v. Pennell*, 737 F.2d 521, 532-33 (6th Cir. 1984); *see also*, *United States v. Olano*, 507 U.S. 725, 739 (1993) (whether viewed as a presumed prejudice test or a case-by-case determination, question in all cases is "did the intrusion affect the jury's deliberations and thereby its verdict."); *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002).

In conducting the *Remmer* hearing and determining whether a remedy is necessary, the trial court is accorded broad discretion.  *See Pennell*, 737 F.2d at 532-33 (discussing *Smith*, 455 U.S. at 217).  The statements of the jurors themselves are not to be regarded as "inherently suspect."  *Smith*, 455 U.S. at 217 n.7.  On the contrary, "one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he had an unbiased mind in a certain matter."  *Id*.  Thus, if a trial court "views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice."  *Pennell*, 737 F.2d at 533; *see also*, *Corrado*, 304 F.3d at 603.  The question of whether an individual juror was impartial is one of historical fact.  *See Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  Thus, a state court's finding of impartiality is presumed correct unless rebutted by clear and convincing evidence.  *See Rushen v. Spain*, 464 U.S. 114, 120 (1983); 28 U.S.C. § 2254(e).

2.    *Analysis*

Prior to the start of the final day of trial, Juror Linda McKether informed the court that she

had been approached at her place of employment and asked to "do what she could." The court and counsel for defendant Parker questioned McKether, who indicated that she had been approached by a man while on her break at work, and he asked her to do what she could, which she took as a plea to help one of the defendants. Although the man did not threaten her, she felt intimidated by the contact and wanted to be removed from the jury. She also indicated that she informed the other jurors that she had been contacted. *See* Trial Tr., Vol. VII, at 4-9. The court removed McKether, over the objection of defendant Parker but not the other defendants. *See id*. at 9-11. The court then questioned each juror individually regarding the contact. Each generally indicated that McKether indicated only that someone had approached her at work and asked her to do what she could for the case. With one exception the jurors all indicated that they did not feel threatened or intimidated by the contact,[7] and in each case the juror indicated that he or she could continue to be fair and impartial. Further, the court gave the prosecutor and counsel for the defendants the opportunity to question each juror. *See id*. at 11-49. The trial court denied the defendants' request for a mistrial, explaining: "They've all indicated to the Court that whatever occurred with Ms. McKether didn't have any impact on them. They continue to indicate to the Court that they were not compromised in any way, and the motions for mistrial are denied." *Id*. at 52. On appeal, the Michigan Court of Appeals found no abuse of discretion in the trial court's handling of the matter. Specifically, the court concluded that "[b]ecause of the brief and limited nature of the excused juror's communication to the remaining jurors and their assertions that they would still reach a verdict based only on the

---

[7]The one exception was Juror Wright, who indicated that she was scared, but also indicated "I'm a nervous person anyway, so I've been nervous through the whole thing." Trial Tr., Vol. VII, at 36. Juror Wright indicated that she could nevertheless decide the case based on the law and facts, and that the contact would not affect her verdict. *See id*. at 37.

law and the facts, the trial court did not abuse its discretion when it decided that the remaining jurors were impartial[.]" *Tillman*, 2004 WL 1459559, at *2, slip op. at 3. The Court should conclude that this determination is reasonable.

As required by *Remmer* and *Smith*, the trial court held a hearing at which it questioned each juror regarding his or her knowledge of the contact made to McKether, and whether that contact would impact the juror's ability to be fair and impartial. The court also permitted counsel for each defendant to question each juror. This was sufficient under the circumstances of the case to satisfy *Remmer*'s hearing requirement. *See Corrado*, 304 F.3d at 604-05. And, as noted above, the trial court's conclusion that the jurors remained impartial is presumed correct unless rebutted by clear and convincing evidence. Here, petitioner has offered no clear and convincing evidence that the remaining jurors were not impartial. Rather, petitioner argues only that, notwithstanding the statements of the jurors, "it is reasonable to believe that their decision-making ability was compromised by the belief that one of the defendants had indirectly attempted to persuade a juror." Amended Pet., at 22; *see also*, Reply Br., at 17. Not only does this argument fail to provide clear and convincing *evidence* rebutting the trial court's conclusion, it is foreclosed by *Smith*, which instructed that courts are not to regard jurors' assessments of their impartiality as "inherently suspect." *Smith*, 455 U.S. at 217 n.7; *see also, id.* ("[O]ne who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he had an unbiased mind in a certain matter."). Thus, the trial court was permitted to "rely upon [the jurors'] assurances in deciding whether [petitioner] . . . satisfied the burden of proving actual prejudice." *Pennell*, 737 F.2d at 533.

In short, as Judge Cohn explained in rejecting the identical claim made by codefendant Parker, "[p]etitioner was not denied a fair trial because of this third party communication with Juror

McKether, because the man's comment to Juror McKether was not unequivocally a threat, Juror McKether was excused from jury service, and the remaining jurors did not express any fear or uneasiness about this contact." *Parker v. Renico*, 450 F. Supp. 2d 727, 736 (E.D. Mich. 2006) (Cohn, J.), *aff'd*, 506 F.3d 444 (6th Cir. 2007). The trial court conducted a hearing in accordance with *Remmer*, and petitioner has not shown evidence that the remaining jurors were anything other than impartial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Request to Amend the Record*

On May 22, 2007, petitioner filed a request to amend the record to include Judge Cohn's decision granting the habeas petition of codefendant Parker. As noted above, in that case Judge Cohn rejected Parker's impartial jury claim. However, Judge Cohn did grant relief on Parker's sufficiency of the evidence claim. Judge Cohn explained that "[n]o witnesses observed [Parker] in possession of any of the weapons that were involved in the incident. [Parker's] fingerprints were not recovered from any of the firearms or from the shell casings that were recovered. The fact that the trial court directed a verdict of acquittal for petitioner on the assault and conspiracy charges removed any link between [Parker], the weapons, and the shooting." *Parker*, 450 F. Supp. 2d at 733. Judge Cohn also noted the uncontroverted testimony that the gun was on the side of the car where Williams, not Parker, was sitting, and that Parker did not run away from the arrest. *See id*. at 734. Accordingly, Judge Cohn concluded that the evidence with respect to Parker showed, at most, mere presence, which is insufficient to hold him criminally liable for possessing the guns. *See id*. at 734-35. This decision was affirmed on appeal. *See Parker*, 506 F.3d at 448-52.

At the outset, it is not clear that amending the record is necessary. Under Rule 7 of the Rules

Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, a court "may direct the parties to expand the record by submitting additional materials relating to the petition," Rule 7(a), but this generally includes things such as "letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge." Rule 7(b). Judge Cohn's decision in *Parker* is not this type of evidentiary material, but is rather a judicial decision entitled to whatever persuasive precedential weight this Court chooses to accord it.

In any event, it is not clear how *Parker* is even relevant here. Petitioner, after discussing the facts of *Parker*, suggests that "[t]he same facts and circumstances exist in the present case with respect to the Petitioner. Petitioner is alleged to be the driver of the vehicle and Parker was one of the passengers. Like Parker, no witnesses observed the Petitioner in possession of the weapons. Nor were Petitioner's fingerprints recovered from any firearms or from shell casings. Accordingly, as a matter of law, the mere fact Petitioner had been in the vehicle is insufficient to support the felony firearm convictions, further supporting the need to vacate Petitioner's conviction and sentence." Request to Amend, at 2. However, petitioner has never raised a sufficiency of the evidence claim. He did not do so at any point in the state court proceedings, and did not do so in his initial or amended petition. To the extent that he now seeks to assert a claim, the claim is barred because it has not been exhausted.

Further, petitioner's situation is not analogous to that of codefendant Parker. Parker had been acquitted of the conspiracy and assault charges, and the only evidence that Parker possessed any of the guns was the mere fact that he was in the car in proximity to the guns. *See Parker*, 506 F.3d at 448-52. Here, on the contrary, the evidence established that petitioner was the driver of the

vehicle that drove to the scene of the shooting and then fled from the scene, attempting to elude police in the process. In light of this evidence, petitioner cannot show that he was merely present during the criminal episode; rather, he was an active participant and at a minimum aided and abetted the others in carrying out the shooting. And, as an aider and abettor of the substantive assault committed using the firearm, and which the conspirators intended to be effected by means of a firearm, petitioner is guilty as an aider or abettor on the felony-firearm charge the same as if he had carried the gun himself. *See People v. Moore*, 470 Mich. 56, 68-73, 679 N.W.2d 50-52 (2004). Thus, even if a sufficiency of the evidence claim had been raised here and was otherwise procedurally proper, petitioner's case is distinguishable from that of codefendant Parker and thus the *Parker* decision has no bearing here. Accordingly, the Court should deny petitioner's request to amend the record.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 7/2/08


The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on July 2, 2008.

s/Eddrey Butts
Case Manager