UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACK TILLMAN, JR.

        Petitioner,

v.

THOMAS BIRKETT,

        Respondent.

_____/

Hon. Victoria A. Roberts

Case No. 06-11555

## ORDER ADOPTING THE REPORT AND
## RECOMMENDATION OF THE MAGISTRATE WITH MODIFICATION

**I.     INTRODUCTION**

This is a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  The matter was referred to Magistrate Judge Paul Komives for a Report and Recommendation ("R&R"), pursuant to 28 U.S.C. § 636(b)(1)(B).  Judge Komives issued an R&R recommending that the Petition be denied.  Petitioner timely filed Objections to the R&R.  For the reasons stated, the Court **ADOPTS** Judge Komives' recommendation with modification.

**II.    BACKGROUND**

Petitioner Jack Dempsey Tillman is a state prison inmate at the Standish Maximum Correctional Facility in Standish, Michigan.  Tillman, along with co-defendants Terrence Williams and Saejar Parker, was tried by a jury in connection with a May 14, 2002 shooting and car chase in the City of Saginaw.  A mistrial was declared for a fourth co-defendant, Elijah Tillman, Jr., after his attorney became sick.  (All subsequent

1

mentions of "Tillman" are made in reference to the Petitioner Jack Dempsey Tillman).

Judge Komives adopted the relevant facts, as summarized by the prosecution in its brief on appeal in the Michigan Court of Appeals:

> The People presented 16 witnesses and introduced over 50 exhibits at trial, including a map, a number of photographs and two videos. One video came from the Michigan State Police [MSP] patrol car involved in pursuing Defendants' vehicle, and a second video came from a City of Saginaw patrol car that arrived at the crash scene to assist with the apprehension of Defendants. (T II-VI)

> The evidence revealed that on May 14, 2002, at about 2:30 a.m., Fred Stewart was sitting outside his residence on Hess Street, near the corner of Russell Street, in the City of Saginaw. Stewart was in the passenger seat of his wife's car that was parked in the driveway. Stewart's wife had picked him up from work and had gone inside their apartment ahead of him. As he sat in the car drinking a beer that he had picked up on the way home from work, he suddenly heard gunfire. When he turned to look down the street he saw a tall black male, who appeared to have braids and appeared to be dressed in black, standing on the sidewalk. Although it was dark and he couldn't see a gun, Stewart did see gunfire. (T II 130-139, 155-158; X 2, 11/Map) Stewart quickly ducked down as shots were repeatedly fired at him in the car. He was hit four times by the gunshots and the car was hit numerous times on the passenger side of the car where Victim-Stewart was sitting. (T II 137-147; X 12, 13, 14) Stewart noted that approximately 5 to 10 minutes before the shooting, he had seen a white car with a black top drive past on a nearby street. (T II 147-151) Later examination of the victim's car revealed seven bullet holes in the vehicle - two at the top post of the door frame and five on the bottom area - below the window - of the passenger-side door. (T V 111-112) Five bullets were recovered from the vehicle. (T V 113)
> When the shooting stopped, Stewart looked up and saw no one was there, he ran to his parent's house farther down the street. From there, his father drove Stewart to the hospital. (T II 147; T VI 108)

> Eric Harvey was a neighbor of Stewart's, who also lived on Hess Street near the intersection of Washington. Harvey was watching television in the early morning hours of May 14th, and heard multiple gunshots causing him to get on the floor. When the shots stopped, he got up, looked out the window and saw someone who appeared to be dressed in black get into the front, passenger-side of a white car that drove off fast. (T III 5-14, 23, 25; X 11/Map) Harvey admitted that although he told police, he thought the car had a black roof, he specified that he told them he wasn't sure if it did. (T III 20, 27)
> Although conditions were very dark, investigators later noted that a

mercury light provided some illumination in the area around the shooting scene. (T V 117118, 124, 128-129)

Two state troopers working together on the midnight shift, in a fully marked car with a bubble on top, were in the City of Saginaw on patrol on May l4th. Their duties were primarily focused on alcohol enforcement. The patrol car contained a video camera located above and to the side of the rearview mirror. The weather was wet with a misty rain coming down. (T III 36-37, 83-88; T V 6-7) At approximately 2:30 a.m., the troopers observed a white four-door Grand Am on Hess Avenue, near South Washington. The white car was driving erratically across the lane divider and accelerating at an excessive speed. (T III 90-91; T V 7-8, 37) The speed limit on Hess was 30 mph, and the troopers observed that the white car was puffing away from them despite the patrol car speed of 40 mph. As they began to go after the white car, the video camera in the patrol car was activated and recorded much of the pursuit. The video reveals very little traffic in the area at the time of the pursuit. (T III 92-94; T V 10-11; X 18/MSP Video) The state police patrol vehicle, however, was behind the white car - at times as much as three blocks or more. In addition, when the car turned corners, there were periods where neither the video camera or the officers had a view of the white car. (T V 18; X 11/Map, 18/MSP Video) When the troopers attempted to initiate a stop for speeding and traffic violations on Hess Street by turning on emergency lights, the white car ignored the signal and turned left onto Elizabeth Street, accelerating away when the patrol siren was activated. Trooper Campbell observed four black males in the white car at that point. About the time their siren was activated, the troopers observed a door on the driver's-side of the car open slightly and then shut. (T III 95-97; T V 14, 19, 41-45; X 18/MSP Video) The video clearly shows the door of the white car opening on Elizabeth Street. Trooper Tuer recalled, although the video is not clear, the driver's side door opening a second time on Hiland Street. (T III 97-98, 142; X 18/MSP Video) When the white car turned from Elizabeth Street onto Hiland - a residential street - the white car made a wide right hand turn - with the pursuing patrol car losing sight of the vehicle for several moments before making the turn also. The white car continued speeding at over 60 mph on Hiland Street - almost jumping the banked intersections that it crossed. (T III 98-99; T V 15-18; X 11/Map, 18/MSP Video) After traveling almost 10 blocks on Hiland, the white car crashed at the intersection of Hiland and Coffingwood Streets, after making what appeared to be a 360 degree spin in the roadway, hitting a curb, a tree and then a utility pole. Defendant Tillman, wearing a blue and black jacket with black pants, immediately emerged from the driver's seat of the vehicle and began to run from the scene. Trooper Campbell jumped from the passenger seat of the patrol car and began to chase the apparent driver - Defendant. (T III 99- 102; T V 19-20; X 11/Map, 18/MSP Video)

3

Trooper Campbell chased Defendant Jack Tillman on foot through several yards, across and around a couple of fences, and across a street. Campbell then lost sight of Defendant, but continued searching with his flashlight. After conferring with two city officers, who had arrived to assist, Campbell found Defendant, wearing the blue and black coat, hiding under a porch behind a house. (T V 20-28, 35) Defendant was breathing heavily and had a distinctive deployed airbag odor - a connection to the deployment of car airbags at the time of the crash. (T V 25-26, 31, 55, 59, 63)  As he was being pulled from under the porch, Defendant Jack Tillman commented that he ran under the porch when he heard shots, that he hadn't been involved in any accident, and that he didn't know anything that was going on. (T V 55-56) At the station, Defendant Jack Tillman saw his cousin and said "hey, that's my cousin, were you involved in the accident, I heard they couldn't find the driver." (T V 57-58) Defendant was not advised of an accident or a missing driver prior to any of these statements. (T V 56, 58)

At the crash scene, Trooper Tuer immediately went to check out the crashed vehicle. (T III 101-102) He noted that the rear-seat passenger-window of the white car was open. (T III 172, 175) Tuer observed three people coming out of the car - Co-defendant Terrence Williams trying get out of the open rear-seat passenger window, Co-defendant Elijah Tillman coming out the door of passenger-side front seat, and Co-defendant Saejar Parker moving in the direction of the driver's-side door. (T III 102-104, 112-113, 172) All appeared to be attempting to get away. Trooper Tuer directed them back into the car to no avail. Defendant Elijah Tillman struggled and kicked the trooper, knocked his flashlight out of his hand, and eventually hit Trooper Tuer in the face with his fist, as well as attempting to pull the trooper's gun from the holster. Elijah Tillman continued to squirm and reach for something inside the car. He was only subdued after the use of pepper spray and with the assistance of another officer. Co-Defendant Williams struggled initially and squirmed to get away but then stopped. A city police officer arrived on the scene and assisted Trooper Tuer in gaining control and handcuffing the resistant Tillman. (T III 37-49, 63, 67-68, 106-118; X 18/MSP Video) The assisting city officer also had a video camera in his patrol car. (T III 35-41) This video also shows at least portions of the struggle to control Co-Defendant Elijah Tillman when the city officer arrived. (T III 46-49; X 15/City Video) The city officer sustained a severe injury to his hand as a result of the struggle with Co-defendant Elijah Tillman. (T III 52, 63-64) Upon subduing Elijah Tillman, officers observed a handgun on the passenger side floor of the white car where he had been reaching. (T III 49-51, 71; X 5, 17, 18) Later investigation revealed that the gun was fully loaded. (T VI 10-12)

When Trooper Campbell returned to the crash scene after turning

4

Defendant Jack Tillman over to other officers for transport, he looked inside the white car and observed two pistols - one on the front passenger-side floorboard, the other one on the rear passenger-side seat. Campbell also noted that front airbags had been deployed. (T V 31-34; X 4, 6, 7, 17, 23) Evidence officers also observed the guns in the vehicle and retrieved them for processing - a .45 caliber handgun on the floor board of the front passenger-side of the car and a .45 semi-automatic handgun on the back seat. The gun on the back seat was fully loaded but jammed. (T V 70, 73-76; X 5, 9, 17, 23, 44) A cell phone, a ski mask, and a glove were found next to the gun on the back seat, with another matching glove found on the floor. A set of keys and another stocking hat was found by the driver's seat, as well as a pager apparently belonging to Defendant. (T V 76-80; T VI 97-99) Officers also seized a fully loaded magazine from between the front passenger seat and door frame. (T V 71) Laboratory examination of the weapons revealed that the .45 caliber gun found on the front floorboard was a single action revolver loaded with hollow point bullets. (T VI 10-12)

At the scene of the shooting on Hess Street, officers found 16 spent casings. The casings were all 9-millimeter semi-automatic and were located in the same general area on the ground. Distinct footwear impressions were also observed - two near the spent casings. (T VI 82-84, 116-118; X 2, 3, 40, 41) Photographs and stone casts were made of the most distinct footwear impressions. (T V 116-120; T VI 4452) At the police station, clothing and boots worn by Defendants were seized, including the dark blue hooded sweatshirt and the size 10 1/2 EEE Dickie work boots worn by Co defendant Terence Williams. (T VI 35-38; X 49, 50) The boots were later submitted to the crime lab, along with footwear impressions and photos from the crime scene. (T VI 44-46) Laboratory scientist David Stevens compared impressions made from the prints at the scene, with impressions from Williams' boots. He found the impressions from the shooting scene, near the shell casings, were consistent in pattern, size and relationship with Williams' boots and could have been made by them. (T V T VI 44, 46, 55-58)

At approximately 5 a.m., while it was still dark, officers looked over the pursuit route with flash and vehicle lights but did not see any evidence. (T VI 81-82, 124-126) At approximately 7 a.m., police officials were informed that a gun had been located along the route of the pursuit of the white car - specifically, on the south side of Hiland Street, near the corner of Owen. (T V 86-89, 98; X 11/Map; X 8, 32, 33/Photos) A student had seen the gun and reported it to a bus driver. The student also reported that he never touched the gun. (T V 134-135) Detective Gwizdala went to that area and surveyed the gun, it's position, location and the surrounding area. He also photographed the area and his findings. (T V 98-104) The gun had an empty clip in it and the slide was locked back. Detective Gwizdala explained that when you fire the last round that automatically locks the

slide back. (T V 105-106; X 31) Detective Gwizdala also explained that the gun had dirt on it, in the barrel, about two inches from the end of the barrel and grass stuck by the slide of the gun - indicating that when it struck the ground, the gun impacted into the soil, approximately two inches. He noted that the gun had a couple of marks reflecting impact - gouge marks on the grip and marks on the barrel. The marks on the gun appeared to come from striking something like concrete, the sidewalk area there. He located what he believed to be the impact area of the gun - about 66 feet from where the gun was eventually found. (T V 100-104, 137-138; X 30) Detective Gwizdala opined that the gun was thrown, from something, or a vehicle, moving at a high rate of speed. (T V 102, 138) More specifically, he indicated:

It had been tossed out of a vehicle or some, something moving at a high rate of speed. It traveled a distance of 66 feet after - after it had struck the ground and buried in about two inches into the ground and then skidded along. (T V 131)  The pursuit video and exhibits established that the impact area and the gun were found in the grass, past the sidewalk, in an area that would be on the passenger side of the car. (T V 157) The location was a short distance from a turn where the troopers and video lost sight of the white car for at least a couple of seconds before making the turn themselves. (X 11/Map; X 18/MSP Video)

Laboratory examination of the gun found embedded in the dirt and grass revealed that it was a 9-millimeter luger, semi-automatic pistol and also revealed dirt in the barrel and grass in the grips. (T VI 18-19, 29; X 30) Firearms expert, Ronald Ainslie, concluded that the 16, fired, 9-millimeter cartridges found at the shooting scene in this case were fired from this 9-millimeter pistol/Exhibit 30 found on Hiland Street. (T VI 26, 31; X 30) He also explained that if this gun was fired at night, you could see the fire shoot out the end of the barrel. (T VI 30)

Detective Ruth testified, without objection, that the investigation revealed two of the three guns in issue had been stolen, including the 9 millimeter. The third gun had been circulating since 2000 from the person who originally owned it, to someone it was traded to, and then someone who bought it and others. (T VI 134136)

At the close of the People's case, counsel for each Defendant moved for a directed verdict of acquittal. (T VI 139-146) The trial court denied the motions in their entirety as to Defendants Jack Tillman and Terrance Williams. (T VI 151-153) For Defendant Saejar Parker, the trial judge granted the motion for directed verdict on Count I - Conspiracy and Count II - assault with intent to murder. (T VI 153-154) On Monday, October 28, 2002, at the beginning of the 7th day of trial, juror Linda McKether reported to the court that someone had made a statement to her about the case over the weekend. She explained that she was at work at a Kessel's store in Saginaw. While she was there, a male who was coming out of the store approached her as she was coming inside after a break. She

6

believed that he knew she was a juror. He asked her to do what she could and she understood this to mean "do what you can for somebody involved in the case." (T VII 4-7) She was not threatened, but she was very upset and wanted to be taken off of the jury. (T VII 510) Counsel for each of the Defendants had an opportunity to question Ms. McKether. (T VII 4-9) The Court excused her and counsel for Defendant Parker objected. (T VII 8-10)

Because Juror McKether indicated that she told the other jurors she had been contacted, the judge proceeded to question each of the jurors, individually, about the situation. Counsel for the Defendants had an opportunity to question the jurors as well. Each of the remaining jurors indicated that they did not feel intimidated by the contact incident experienced by Juror McKether and would not let the situation affect their decision in the case. (T VII 9-50) At the conclusion of the individual questioning of each juror, the trial judge noted:

[The] Court believes, after questioning each of the individual jurors, that none of the jurors have been contaminated other than Ms. McKether by this contact which was made directly to her. (T VII 50) All of the defense counsel, however, joined in a request for a mistrial on the basis that the one black female juror was approached and she was afraid and it might or could have detrimental effect on the Defendants. (T VII 51-52) The trial judge denied the motion for mistrial, stating:

The Court has questioned each and every one of the jurors. They've all indicated to the Court that whatever occurred with Ms. McKether didn't have any impact on them. They continue to indicate to the Court that they were not compromised in any way, and the motions for mistrial are denied. (T VII 52)  At that point, defense counsel for Williams indicated he had one witness to call before closing arguments. (T VII 52) The trial judge then indicated: I'm going to keep the--so that we don't have any more problems, I going to keep the courtroom clear of everybody except the people that are involved in the case, the defendants, and the officers that are involved. (T VII 52)  The jury returned to the courtroom and counsel for Defendant Williams then called witness Barry Nelson, the Central Dispatch 9-1-1 operator. He was questioned about whether patrol car cameras have their clocks or timers synchronized with Central Dispatch and explained that the time or clock on the camera and video is not connected to Central Dispatch in any way. (T VII 56-57) Counsel for each of the Defendants then rested. (T VII 58)

As the prosecutor began his closing argument, counsel for Defendant Parker, joined by the other defense counsel, requested that the judge open the courtroom for friends and family of the Defendants. (T VII 59-60) The trial judge agreed to do so and opened the courtroom. (T VII 60)

On October 29, 2002, Tillman was convicted in the Saginaw County Circuit Court

of: Conspiracy to Commit Murder (MCL 750.157a, 750.316(1)(a)), Assault with Intent to Murder (MCL 750.83), Possession of a Firearm During the Commission of a Felony - 2 counts (MCL 750.227b), Felon in Possession of a Firearm (MCL MCL 750.224f), Fleeing and Eluding - Third Degree (MCL 750.479a(3)), and Resisting and Obstructing a Peace Officer (MCL 750.479).

Tillman was sentenced as a habitual offender 2nd (MCL 769.10) to concurrent prison terms of life on the conspiracy conviction, 29 - 50 years on the assault conviction, 36 - 90 months on the felon in possession conviction, 36 - 90 months on the fleeing and eluding conviction and 2 - 3 years on the resisting and obstructing conviction. Those sentences were to be served consecutive to two (concurrent to each other) two-year terms for the felony-firearm convictions.

Tillman filed a motion for new trial and resentencing. He argued that his counsel was ineffective for not objecting to evidence of a prior felony on the felon in possession charge, because his prior offense was not a qualifying felony under the statute. On June 30, 2003, the trial court denied the motion for new trial, but vacated the conviction and sentence on the felon in possession charge. On Tillman's motion for reconsideration, the trial court granted resentencing based on his claim that his habitual offender status was inaccurate at the initial sentencing.

Tillman filed an appeal by right with the Michigan Court of Appeals, in which he raised the four claims raised in this petition. The court affirmed Tillman's convictions and sentences. See *People v. Tillman*, No. 245442, 2004 WL 1459559 (Mich. Ct. App. June 29, 2004) (per curiam). The Michigan Supreme Court denied Tillman's application for leave to appeal. See *People v. Tillman*, 471 Mich. 954, 690 N.W.2D 116 (2004).

8

On March 31, 2006, Tillman filed a *pro se* application for a writ of habeas corpus, raising the four claims that he raised in the state courts.  On October 31, 2006, Tillman filed an amended application through counsel, asking the Court to vacate his convictions and sentences.  Tillman's amended application raises four challenges:

I.  Tillman received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

II.  Tillman was deprived of his constitutional right to a public trial by the court's *sua sponte* action in clearing the courtroom of spectators.

III.  Tillman was denied a fair trial in violation of the due process clause of the Fourteenth Amendment to the United States Constitution by the introduction of irrelevant evidence that the guns found in the vehicle were stolen.

IV.  Tillman was denied his right to trial by an impartial jury and should have been granted a mistrial after a juror was dismissed and interviews with other jurors disclosed that they believed someone from the defendants' side had attempted to influence that juror.

On May 22, 2007, Tillman filed a request to amend the record to include Judge Avern Cohn's decision in *Saejar Deonte Parker v. Paul H. Renico*, Case No. 05-71106 (E.D. Mich. 2006), granting the habeas petition of co-defendant Parker.

On July 6, 2008, Magistrate Judge Paul Komives entered his Report and Recommendation that Tillman's application for a writ of habeas corpus be denied.  On July 17, 2008, Tillman timely filed objections to the R&R.

## III.   STANDARD OF REVIEW

This Court reviews *de novo* those portions of an R&R to which specific objections

9

are made. *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72(b)*. See also *U.S. Fidelity and Guar. Co. v. Thomas Solvent Co.*, 955 F.2d 1085, 1088 (6th Cir. 1992) (noting that a district court conducts de novo review of magistrate judge's rulings on dispositive motions); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate's report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."). The Court may accept, reject or modify any or all of the Magistrate Judge's findings or recommendations. 28 U.S.C. § 636(b)(1).

This action is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See, e.g., *Penry v. Johnson*, 532 U.S. 782, 791, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). Under the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  An "unreasonable application" occurs

10

when the state court identifies the correct legal principle from a Supreme Court decision but unreasonably applies that principle to the facts of the petitioner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

## IV.   APPLICABLE LAW AND ANALYSIS

### A. Ineffective Assistance of Counsel

Tillman first argues that counsel was ineffective by stipulating, erroneously, that Tillman had previously been convicted of a predicate felony under the felon in possession statute.  Because there was no direct physical or eyewitness evidence connecting him to the crimes, Tillman says the erroneous stipulation infected the jury against him and affected the integrity of the proceeding such that a new trial is necessary.  He cites *Parker v. Renico*, 05-71106 at 10 (E.D. Mich., August 30, 2006), granting co-Defendant Saejer Parker's petition for writ of habeas corpus, as evidence that Magistrate Judge Komives erred in stating there was significant evidence that the persons in the car which crashed were the ones responsible for the shooting.

Tillman's reliance on *Parker* is misplaced.  *Parker* found that the directed verdict of acquittal for Parker on the assault and conspiracy charges removed any link between Parker and the shooting.  The court noted that Parker was seated as a rear passenger, on the opposite side from where one of the guns were found.  Accordingly, there was insufficient evidence to sustain his convictions of felon in possession and felony firearm. *Parker,* 05-71106 at 10.

11

Tillman, by contrast, was convicted of assault and conspiracy, and there was significant circumstantial evidence establishing his guilt.  While patrolling the area of the shooting scene, troopers heard gun shots around 2:30 a.m.  The victim's neighbor testified that he saw a white car speed away after the gunshots stopped.  Troopers saw a white car driving erratically and when they attempted to initiate a traffic stop, the driver ignored the signal and accelerated away.  During the troopers' pursuit of the white car, the driver's door opened twice, once when the siren was activated and again on Hiland Street.  The troopers pursued the white car for nearly 10 blocks before it crashed at the intersection of Hiland and Coffingwood streets.

After the crash, Trooper Campbell saw the driver exit the white car and run from the scene.  Trooper Campbell chased after the driver, who was wearing a black and blue coat and black pants.  Trooper Campbell briefly lost sight of the man he was chasing, but later found Tillman hiding under a nearby porch, wearing the same clothing as the driver, breathing heavily, and having a distinctive deployed airbag odor.  Tillman had a glove in his pocket when he was arrested.  When Trooper Campbell later returned to the crash scene, he looked inside the white car and noted the front airbags were deployed.  A set of keys, a stocking hat, and a pager belonging to Tillman were found by the driver's seat.  Officers also recovered two handguns, a ski mask, and a glove from inside the car

Around 7:00 am, police officials were informed that a gun was located along the pursuit route of the white car.  The gun had dirt both on the outside and inside the barrel, as well as a couple of impact marks.  A detective opined that the gun was thrown from something moving at a high rate of speed.  A firearms expert concluded that the

fired cartridges found at the shooting scene were fired from this gun.

This demonstrates there was significant substantial circumstantial evidence that Tillman was the driver of the white car and that he aided and abetted the shooter by speeding away from the shooting scene.  Moreover, the glove, stocking hat and handguns showed that Tillman was involved in a planned shooting.  "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v. Allen*, 201 Mich. App. 98, 100, 505 N.W. 2d 869 (1993).  In light of the overwhelming circumstantial evidence and reasonable inferences connecting Tillman to the crimes, the Magistrate correctly determined that the brief mention of his prior conviction did not unduly prejudice him.

Tillman also argues that the Magistrate misrepresented the prejudice standard for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 695 (1984).  He says he was not required to demonstrate that the jurors would have acquitted him but for the stipulation regarding the earlier felony, as the state appeals court concluded.  Thus, he says the state court's decision and interpretation of the *Strickland* prejudice prong is contrary to, or involves an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Under the familiar *Strickland* test, to establish ineffective assistance of counsel, a defendant must show both deficient representation and prejudice. *Id.* at 698.  To meet his or her burden, "a petitioner must show that (1) the performance of counsel fell below an objective

13

standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-694; see also *Burton v. Renico*, 391 F.3d 764, 773 (6th Cir. 2004). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Burton* at 773.

Tillman says the stipulation was prejudicial despite the fact that jurors were not given details about his prior offense, because they were mistakenly led to believe he had previously committed a serious felony offense.  He cites *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994) for the proposition that introduction of prior acts evidence, regardless of the stated purpose, creates a great likelihood that the jury will use the evidence in the wrong fashion.

In *Johnson*, a defendant convicted of possession with intent to distribute cocaine challenged the admission of evidence, under Fed. R. Evid. 404(b), of two prior narcotic sales to a confidential informant.  The appeals court found that although the district court gave three substantially incorrect and contradictory limiting instructions which likely confused the jury, the instructions did not contaminate the verdict because among other things, the evidence of defendant's guilt was overwhelming.

Unlike *Johnson,* where the jurors heard that the defendant had committed essentially the same crime on earlier occasions, here the jurors did not receive any details about Tillman's prior conviction.  Also, the trial court cured the error by vacating Tillman's felon in possession conviction.  And, there was significant circumstantial evidence of Tillman's guilt on the remaining offenses.  Under these circumstances, Tillman has not established a reasonable probability that but for counsel's error, the

14

result of the proceeding would have been different.  Moreover, the error did not seriously affect the fairness and integrity of the proceeding.  Tillman is not entitled to habeas relief on this claim.

## B.  Denial of Right to a Public Trial

Tillman next says he was denied his constitutional right to a public trial by the trial court's *sua sponte* closing of the courtroom for the testimony of the 911 operator. Magistrate Komives concluded this claim was procedurally defaulted and forfeited, and notwithstanding the state appeals court's review of the claim, it did not negate the finding of a procedural default.

State prisoners are required to exhaust their state remedies prior to seeking habeas corpus relief in federal court. 28 U.S.C. § 2254(b),(c).  If a habeas petitioner fails to "obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim," the claim is considered procedurally defaulted. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. See *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989).  Plain error review does not constitute a waiver of state procedural default rules. See *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007); *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).  Federal courts will not consider the merits of procedurally defaulted claims. *Lundgren* at 763.

15

A petitioner's procedural default may be excused, however, upon a showing of "cause" for the procedural default and "actual prejudice" as a result. *Id*. In order to demonstrate cause, the petitioner must show "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id*. at 763-64. Demonstrating actual prejudice requires "showing that the trial was infected with constitutional error." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003). Where there is strong evidence of petitioner's guilt and a lack of evidence to support petitioner's claim, actual prejudice has not been shown. *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Furthermore, "habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome the procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced." *Lundgren* at 764.

Procedural default may also be excused upon a showing that failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *Lundgren* at 763. Conviction of one who is "actually innocent" results in a fundamental miscarriage of justice. *Id*. at 764.

Tillman says the Magistrate's finding regarding procedural default was erroneous since the court of appeals relied on a portion of *People v. Carines*, 460 Mich. 750, 763 (1999) which discussed only nonconstitutional error. He says because *Carines* was based heavily on federal case law and rules of procedure, the rule relied upon by the state court did not rise to the level of an independent and adequate state procedural

16

rule, and the claim was not procedurally defaulted.  Additionally, Tillman says the state court did not make a plain error determination, but rather limited its review to whether the closing of the courtroom adversely affected Tillman's substantive rights.

The Court finds that this argument lacks merit.  As the Magistrate determined, the court of appeals expressly relied on Michigan's contemporaneous objection rule to review Tillman's claim only for plain error.  That the court of appeals cited to page 763 of *Carines*, which involved a discussion of nonconstitutional error, does not make the cited procedural bar dependent on federal law.  The *Carines* court expressly adopted the same standard for review of forfeited constitutional errors. *Carines* at 764. Therefore, the rule relied upon by the court of appeals was an adequate independent state ground.

Tillman procedurally defaulted this claim by failing to raise it with a contemporaneous objection at trial, as required by Mich. R Evid. 103.  Accordingly, this Court can only review this claim if Tillman demonstrates cause and prejudice. *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-424 (6th Cir. 2003).

Tillman says his trial counsel's failure to object to the closure of the courtroom establishes cause.  Tillman also says he was prejudiced by trial counsel's failure to object to the clearing of the courtroom, because the judge's message to the jurors was that someone acting on behalf of one of the defendants improperly approached one of the jurors and attempted to persuade them to help that defendant.  This message, Tillman says, made it appear that the defendants were guilty and needed to threaten jurors to overcome the evidence presented at trial.

However, as Respondent notes, Tillman failed to raise an ineffective assistance

17

of counsel claim with the state court of appeals based on his trial attorney's failure to object to the clearing of the courtroom.  The ineffective assistance of counsel claim, therefore, is also procedurally defaulted and the Court is precluded from considering it as cause to excuse Tillman's procedural default on his claim of denial of the right to a public trial. See *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).

Tillman also claims that appellate counsel's failure to raise the issue establishes cause and prejudice.  For claims of ineffective assistance of appellate counsel, the defendant must show that appellate counsel failed to raise an issue which was reasonably probable to have changed the result on appeal. *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).  Tillman fails to show that if appellate counsel had raised this issue, there is a reasonable probability the result would have been different on appeal.

Tillman, then, is left to argue that the Court's refusal to evaluate his procedurally defaulted claim would result in a manifest miscarriage of justice because he is actually innocent of the crimes of which he was convicted. See *Schlup v. Delo*, 513 U.S. 298, 314-15, 130 L. Ed. 2d 808, 115 S. Ct. 851 (1995).  The Court is not persuaded; Tillman is not entitled to habeas relief on this claim.

### C.  Admission of Evidence Relating to Guns' History

Tillman says he was denied a fair trial by the admission of irrelevant evidence relating to the guns' history. He argues that admission of evidence regarding the guns' history had no bearing on the determination of his guilt or innocence and was prejudicially erroneous, where no one could identify the shooter and there was no physical evidence linking Tillman to the weapon.  Magistrate Judge Komives agreed with the Michigan Court of Appeals that "the evidence relating to the guns' history was

18

relevant to give a complete picture of the crime . . ."   Because he viewed the evidence as relevant, the Magistrate determined that its admission did not deprive Tillman of a fair trial even if its admission was erroneous as a matter of law.

"Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994), citing *Fuson v. Jago*, 773 F.2d 55, 59 (6th Cir. 1985). Only "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.2003).

Tillman did not object to the admission of this evidence at trial, and raised the matter for the first time on direct appeal.  The Michigan Court of Appeals reviewed this unpreserved evidentiary issue for plain error and held that the trial court did not commit plain error by admitting evidence of the guns' history.  The court of appeals reasoned that evidence regarding the guns' origins and histories related to the issues of possession and the shooter's identification, and the jury could also infer that defendants used untraceable guns so police could not link them to the planned assault.

As previously discussed, federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See* discussion supra.  Moreover, plain error review does not constitute a waiver of state procedural default rules. *Id.*  Therefore, this claim is procedurally defaulted. Tillman must establish cause and prejudice to excuse his default, or show that a miscarriage of justice has occurred.

Tillman raises no basis to excuse his default of this claim and does not meet the

19

cause and prejudice exception.  Tillman likewise failed to show that a manifest
miscarriage of justice would result if the Court declined to review this procedurally
defaulted claim.  Tillman is not entitled to habeas relief on this claim.

      **D.**    **Denial of Right to an Impartial Jury**

      Tillman says he was denied the right to a trial by an impartial jury, when the trial
court denied his motion for a mistrial after dismissing Juror McKether, who had been
contacted by a third party.  Tillman contends that the trial court's interviews with the
remaining jurors revealed they believed someone acting for the defendants attempted to
influence the dismissed juror, and this shows the jurors were contaminated against the
defense.      The Magistrate, relying on *Smith v. Phillips*, 455 U.S. 209 (1982),
determined that the trial court's handling of the matter was adequate.

      The Sixth Amendment guarantees the right to a trial by an impartial jury. *Duncan
v. Louisiana*, 391 U.S. 145, 147-149 (1968).  The constitutional standard of fairness
requires that a defendant in a criminal case have a panel of impartial, "indifferent"
jurors. *Irvin v. Dowd*, 366 U.S. 717, 722(1961). The question of whether a trial court
has seated a fair and impartial jury is a factual one, involving an assessment of
credibility. *Gall v. Parker*, 231 F. 3d 265, 308 (6th Cir. 2000)(citing *Patton v. Yount*, 467
U.S. 1025, 1038 (1984)).  A state trial court's finding on the impartiality of a juror or a
jury is a factual finding that is presumed correct under § 2254 unless a habeas
petitioner can prove otherwise by convincing evidence. *Gall*, 231 F. 3d at 334.

      Tillman has not made that showing.  Tillman was not denied a fair trial because
of this third party communication with Juror McKether, because the man's comment to
Juror McKether was not unequivocally a threat, Juror McKether was excused from jury

service, and the remaining jurors did not express any fear or uneasiness about this contact.  Tillman is not entitled to habeas relief on this claim.

### E.  Request to Amend the Record

Tillman moved the Court to amend the record to include the findings of fact and conclusions of law in *Parker,* on the ground that the same facts and circumstances exist.  The Magistrate determined the request should be denied because Tillman's case was distinguishable from *Parker* and because it was not clear that amending the record was necessary.  Tillman disputes that finding.

Rule 7 of the Rules Governing Section 2254 Cases provides that "[i]f the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition. The judge may require that these materials be authenticated." R. Governing § 2254 Cases U.S. Dist. Cts. 7(a).  "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record." R. Governing § 2254 Cases U.S. Dist. Cts. 7(b).

Under Rule 7, a judge can direct expansion of the record to include any appropriate materials that enable the judge to dispose of some habeas petitions not dismissed on pleadings, without time and expense required for an evidentiary hearing. *Blackledge v Allison* (1977) 431 US 63, 52 L Ed 2d 136, 97 S Ct 1621.

The *Parker* case does not help the Court dispose of Tillman's habeas petition. As the Magistrate notes, *Parker* is not relevant because Tillman has never raised a sufficiency of the evidence claim in the state courts or in his original or amended habeas

21

petitions.  To the extent that he seeks to assert such a claim here, it is barred because the issue has not been exhausted. See *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts).  Moreover, as outlined above, his case is distinguishable from *Parker*.  The Court agrees that it is not necessary to amend the record.

## V.    CONCLUSION

The Court **ADOPTS** the Magistrate's R & R recommending the denial of Tillman's Petition for Writ of Habeas Corpus with the following modification:

A.  Tillman's claim regarding admission of the guns' history is procedurally defaulted.  Tillman has not established cause and prejudice to overcome the procedural default, nor has he established that a manifest miscarriage of justice would result if the Court declined to review this procedurally defaulted claim.

Tillman has not established that he is in the State of Michigan's custody in violation of the Constitution or laws of the United States.  Accordingly, Tillman's Petition for Writ of Habeas Corpus is **DENIED**.

**IT IS ORDERED**.

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 17, 2009

22

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 17, 2009.

s/Linda Vertriest
Deputy Clerk